RICHMAN TOWERS TENANTS' ASSOCIATION, INC., et al., Appellants,

v.

RICHMAN TOWERS LLC, et al., Appellees.

Nos. 08–CV–1027, 08–CV–1114, 08–CV–1340, 08–CV–1354, 08–CV–1438 & 09–CV–106.

District of Columbia Court of Appeals.

Argued Jan. 14, 2010.

Decided April 14, 2011.

David E. Kouba, with whom Robert D. Brown, Washington, DC, was on the original briefs, for appellants.

Steven K. Davidson, with whom Michael J. Baratz, Washington, DC, and Gary D. Wright, Bethesda, MD, were on the brief, for appellees.

Bonnie I. Robin–Vergeer filed briefs for the Legal Aid Society of the District of Columbia, amicus curiae, in support of appellants.*

Before REID and KRAMER, Associate Judges, and SCHWELB, Senior Judge.

Schwelb, Senior Judge:

The tenant associations of each of six apartment complexes to which these consolidated appeals relate [1] brought civil actions challenging the legality of the alleged sale of each building by Howard and Maxine Bernstein and their family (the Bernsteins) to limited liability companies (LLCs) controlled by Carmel Partners (Carmel or the owners). Each association claimed that the transfer of ownership of the building in which it represented the tenants constituted a sale within the meaning of the Tenants' Opportunity to Purchase Act (TOPA), D.C.Code §§ 42–

---

* Following oral argument, the court twice ordered supplemental briefing of additional issues. The Legal Aid Society of the District of Columbia did not participate in the pre-argument briefing, but filed *amicus* briefs discussing the issues addressed in the parties' supplemental briefs.

1. The six buildings are: Richman Towers, Marconi Park, Argonne (formerly Park Plaza), Barclay Apartment, Sarbin Towers, and Lanier Apartments.

3404.02(a) *et seq.* (2001), and that the tenants had been denied "the right to purchase the accommodation at a price and on terms which represent a *bona fide* offer of sale." *Id.* The six cases came before five different judges, and in each of them the trial court granted the owners' motion for summary judgment, on the ground that the transfer of ownership did not constitute a sale within the meaning of TOPA,[2] or because, in the court's view, the tenant association bringing the suit lacked standing,[3] or in four of the cases, on both grounds.[4]

On appeal, the associations claim that all six of them have "associational standing" to bring the actions; that even if they do not have "associational standing," there are genuine issues of material fact which should have precluded the entry of summary judgment denying them statutory standing pursuant to D.C.Code § 42–3401.03(18) (2001); and, that in any event, two of the associations, Barclay Tenants' Association (BTA) and Lanier Apartments Tenants' Association (LATA) have statutory standing. The associations also contend, on a variety of grounds, that the transfers constituted a sale within the meaning of TOPA. The owners[5] challenge the standing of each of the associations and contend that the transactions at issue did not constitute a sale.

We hold that summary judgment was appropriately granted, for lack of standing, against all of the associations except the BTA and the LATA. We conclude, however, that the BTA and the LATA have statutory standing to bring their respective actions. We conclude that, under precedent binding on the division, none of the associations has "associational standing."

Turning to the substantive issues, we hold, in conformity with this court's recent decision in *Waterside Towers Resident Ass'n v. Trilon Plaza Co.,* 2 A.3d 1084 (D.C.2010), that the transfers in this case constituted a sale subject to TOPA. In response to a question of first impression raised by the owners for the first time on appeal, we conclude that D.C.Code § 42–3404.02(a) applies to all sales and does not restrict the requirement of notice to tenants to situations where the sale is only for the purpose of demolition or discontinuance of housing use.[6]

In light of the foregoing holdings, we affirm the judgments in Nos. 08–CV–1027, 08–CV–1114, 08–CV–1354, and 09–CV–106. We reverse the judgments in Nos. 08–CV–1438 and 08–CV–1340, and we remand Nos. 08–CV–1438 and 08–CV–1340 to the trial court for further proceedings consistent with this opinion.

**2.** *Lanier Apartments Tenants' Ass'n, Inc. v. Lanier Regal, LLC, Inc. et al.* (Judith Retchin, J.).

**3.** *3150 16th Street Tenants' Ass'n v. Marconi Park II, LLC, et al.* (Jeanette J. Clark, J.).

**4.** *Richman Towers Tenants' Ass'n, Inc. v. Richman Towers, LLC* (Maurice L. Ross, J.); *Barclay Tenants' Ass'n, Inc. v. Barclay Apartments, LLC, et al.* (Jeanette J. Clark, J.); *Argonne Tenants Council, Inc. v. Park Plaza Apartments* (Natalia Combs Greene, J.); *3312 16th Street Tenants' Ass'n, Inc. v. Sarbin Towers, LLC, et al.* (Jennifer Anderson, J.).

**5.** We include in the term "the owners" the transferors as well as the transferees in the transactions alleged by the associations to have constituted a sale. The transferors and transferees are represented by different counsel, but they have filed joint briefs.

**6.** The owners also assert that unless TOPA is given the narrow construction for which they contend, then it is unconstitutional. We reject this contention as well.

## I.

## FACTUAL BACKGROUND

These cases have their inception in a multi-million dollar real estate deal involving several rental properties. In early 2004, the Bernsteins decided to sell eleven of their apartment buildings in Washington, D.C., and to relocate their business operations to Florida. The properties were listed with the brokerage firm of Marcus & Millichap. One of the brokers at that firm contacted Ron Zeff, a member of Carmel, to inquire if Carmel was interested in acquiring the properties. Soon thereafter, Carmel sent the Bernsteins a non-binding letter of intent to purchase the buildings. Carmel offered to purchase all eleven properties for $88,000,000, treating the deal as a single transaction even though the sale was to be structured to maintain the status of each building as a single-purpose entity. After an inspection period, the parties entered into a final purchase and sale agreement providing for the transfer of the eleven buildings for $83,000.000.

The agreement called for two nominally separate transactions, both to be implemented on the same day. In the first transaction, the Bernsteins were to trans-fer the deed for each property, without negotiation or consideration, to a newly formed LLC (LLC II) controlled solely by them. In the second transaction, membership interests in these LLC II entities would be transferred to Carmel, which would purchase 99.99% of these interests, and to Quarry Enterprises, which was to acquire the remaining 0.01% interest.

The minority transferee, Quarry, was formed on April 19, 2004 under the laws of the District of Columbia. At the time of its formation, Quarry had a single member, Jim Ferris, the broker who had brought the properties to the attention of Carmel Partners. Ferris testified on deposition that he formed Quarry after receiving a telephone call from the president of Carmel. He stated that he did not know why Quarry was formed.[7]

The agreement between the Bernsteins, Carmel and (ostensibly) Quarry was contingent on the approval of the transaction by the District of Columbia Department of Consumer and Regulatory Affairs (DCRA). On April 26, 2004, Richard Luchs, Esquire, counsel for the transferors and transferees, sent a letter to the DCRA requesting confirmation that the proposed transfer, which did not provide for notice to the tenants or an opportunity to pur-

---

7. Quarry's practical role in the transaction was nominal at best. As the associations point out in their brief (with little or no contradiction from the owners), Quarry was set up to receive an interest, which amounted to only 0.01% of the purchase price, in order to permit the transaction to proceed without triggering the requirements of TOPA.

Quarry did not possess any characteristic of a genuine business entity. It had no employees. Its only officer and representative was Mr. Ferris, the real estate broker, who became involved in the June 30, 2004 sale before Quarry was formed. Mr. Ferris had known the president of Carmel for many years.

Quarry did not have an office or an accountant, nor had it filed a tax return. It had never entered into any agreement, aside from those related to the 2004 transaction for which it was established. Quarry had never made any loans, or purchased insurance, or made cash distributions, and it had never opened or maintained a bank account. In fact, during the course of his deposition, Mr. Ferris, the only person associated with Quarry Enterprises, did not know the company's location:

Q. Do you know where [Quarry's] new principal place of business would be?

A. No.

The witness also testified that he had never received any compensation from Quarry for any work that he had performed.

chase the accommodations at a price and terms which represent a bona fide offer of sale, would not violate the Rental Housing Conversion and Sale Act of 1980 (RHCSA). At the time, the relevant provision of the Act stated that a "sale" that would trigger TOPA rights included

> the transfer of 100% of all partnership interests in a partnership which owns the accommodation as its sole asset to 1 transferee or of 100% of all stock of a corporation which owns the accommodation as its sole asset to 1 transferee in 1 or more transactions occurring during a period of 1 year from the date of the first such transfer. . . .

D.C.Code § 42–3404.02(c) (2001).

On April 29, 2004, only three days after the date of Mr. Luchs' communication, Linda Harried, the DCRA's Housing Regulation Officer, responded with a letter to Mr. Luchs in which she described the transactions as follows:

> The Properties consist of residential rental units located at 1616 16th Street, N.W., 1754 Lanier Place, N.W., 1845 Summit Place, N.W., 3150 16th Street, N.W., 2637 16th Street, N.W., 1629 Columbia Road, N.W., 2714 Quarry Road, N.W., 1604–1610 16th Street, N.W., 105 6th Street, S.E., 3055 16th Street, N.W., and 3132 16th Street, N.W.

Sellers will form eleven (11) limited liability companies ("LLCs") that will be wholly owned by Sellers, and Sellers will transfer the title of the Properties to the new LLCs.

One Hundred (100%) of the membership interests in each new LLC will be owned by the respective Seller/Transferor, which will simply be changing the form of ownership, not the ultimate ownership of the Properties.

You have advised me that each Seller will sell and assign a maximum 99.99% of the membership interest in the new LLC's to Carmel Partners, LLC, or assigns ("Carmel") and a minimum .01 [8] to an unrelated entity, Quarry Enterprises, or assigns ("Quarry Enterprises"). There is no common ownership between Carmel and Quarry Enterprises.[9]

Ms. Harried concluded that "the transfer of 100% of the membership interests in the limited liability companies to two (2) separate and unrelated entities, whether directly or indirectly, as described above, does not constitute a 'sale' or 'sell' as those terms are defined by the Act. Therefore *this transaction* is exempt from the statutory requirements of Title IV of the Act" (emphasis in original).[10] The deal closed

---

8. Presumably, Ms. Harried meant 0.01%.

9. This description is substantially identical to the facts related in Mr. Luchs' April 26, letter.

10. The approval process utilized by the DCRA in this case has since been abandoned after it was characterized by the District of Columbia government as "extremely flawed." According to a report of the Council's Committee on Consumer and Regulatory Affairs dated March 1, 2005, requests for exemption letters such as the one obtained in this case were regularly

> accompanied by draft versions of the opinion letters that would be signed by the head of the DCRA Division, Ms. Linda Harried

(whose title is Housing Regulation Officer). None of these requests for letters were ever rejected. *Out of 63 letters, which the Committee reviewed, not a single word was changed from the submitted draft.* Essentially, Ms. Harried—who is not a lawyer— retyped the letters, affixed her signature, and sent them back to the lawyers who represented the landlord clients who profited significantly from these exemption or comfort letters.

(Emphasis added.) The report also stated:

> *The supervision over the entire process of issuing these exemption letters was almost entirely lacking and in every case inadequate.* Ms. Harried is not a lawyer. As was plain by her testimony at the Commit-

on June 30, 2004, and each of the eleven buildings was transferred in conformity with the agreement.

More than a year later, in August of 2005, the DCRA notified counsel for the owners of the buildings that it was opening an investigation "into the facts and circumstances" of the issuance of the opinion letter in which the agency had concluded that the transaction did not meet the definition of a sale within the meaning of TOPA. On December 16, 2005, Leila Franklin, the DCRA's Deputy Director for Compliance Inspections, issued a report on behalf of the agency in which she reaffirmed the DCRA's position that the transaction was not a sale. Ms. Franklin, wrote, however, that "the Exemption Letter was consistent with a longstanding practice that the current DCRA Administration has ceased, notwithstanding that the practice was legally sustainable." She noted that the tenants of some of the buildings proposed to challenge the transaction as contrary to TOPA, and she stated that the agency's findings were not intended to preclude the tenants' ability to do so.

At five of the eleven buildings which had been transferred in conformity with the agreement, a number of the tenants had begun to discuss among themselves, and with a member of the Council of the District of Columbia, the possibility that they had been unlawfully denied the opportunity, under the provisions of TOPA, to purchase the buildings. Less than two weeks

before the three-year statute of limitations was to expire, the tenants' associations at the various complexes held meetings and amended their bylaws to permit former tenants to become members of the associations. These amendments were designed to give the associations a sufficient number of members to qualify for standing under TOPA. On June 29, 2007, the day before any civil action would become time-barred, five of the associations filed separate suits in which they asked the Superior Court, *inter alia*, to invalidate the transfers. A sixth association, which was formed by five tenants of the Park Plaza building after the existing Park Plaza Tenants' Association decided not to institute litigation, filed suit on the following day, Saturday, June 30, 2007.

Following discovery, each of the defendants filed a motion for summary judgment claiming, *inter alia*, that the transactions in question were not sales within the meaning of TOPA, and that the rights created by that statute did not apply. All six of the trial courts, as we have noted, granted summary judgment in favor of the defendants. These consolidated appeals followed.

## II.

## STANDING

■ The owners contend, and five of the trial courts have held, that the associations

---

tee hearing on March 4, 2005, Ms. Harried had a limited understanding of basic legal concepts that required legal review by a competent official before issuing a letter that invariably affected tenants' legal rights. (Emphasis added.)

Because the process used by the DCRA was so severely criticized by the Committee, and because the determination that TOPA was inapplicable to the transactions in this case was evidently made by a non-lawyer who was unfamiliar with the applicable legal princi-

ples, we accord less deference to the agency's view than would ordinarily be the case. *See, e.g., Harris v. District of Columbia Office of Workers' Compensation,* 660 A.2d 404, 407 (D.C.1995). In addition, Ms. Harried determined that the contemplated transaction was not a sale more than six years before our decision in *Waterside,* and the DCRA did not have the benefit of this court's decision in a case presenting facts very similar to those before her.

lack standing to institute these actions. "Standing is a threshold jurisdictional question which must be addressed prior to and independent[ly] of the merits of any party's claim." *Grayson v. AT & T Corp., et al.,* 15 A.3d 219, 229 (D.C.2011) (en banc) (quoting *Bochese v. Town of Ponce Inlet,* 405 F.3d 964, 974 (11th Cir.2005) (citations omitted)); *see generally, Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Accordingly, we begin our analysis by addressing the issue of standing, and we review *de novo* the orders granting summary judgment in favor of the owners for lack of standing. *See, e.g., Board of Directors of Washington City Orphan Asylum v. Bd. of Trustees of Washington City Orphan Asylum,* 798 A.2d 1068, 1074 (D.C.2002); *Abdullah v. Roach,* 668 A.2d 801, 804 (D.C.1995).

The associations claim that they had both statutory standing and associational standing to bring these actions. We consider each of these contentions in turn.

A. *Statutory Standing*

■ An organization has the burden to show that it has standing to bring its suit. *Friends of Tilden Park, Inc. v. District of Columbia,* 806 A.2d 1201, 1210 (D.C.2002). In order to carry this burden with respect to statutory standing, each association must demonstrate that it qualifies under the following statutory definition:

"Tenant organization" means an organization that represents at least a majority of the heads of household in the housing accommodation excluding those households in which no member has resided in the housing accommodation for at least

90 days and those households in which any member has been an employee of the owner during the preceding 120 days.

D.C.Code § 42–3401.03(18). The owners assert that "to prove it has standing, [an] Association must: (1) know the total number of heads of household who resided in the apartment building for at least the 90–day period prior to the June 30, 2004 transfers; and (2) prove that at least half-plus-one of these heads of household were members of the tenants' association *when the complaint was filed.*" (Emphasis added.) [11] The owners also assert that "[t]enants who move out of an apartment building are not eligible members of an association for [purposes of] standing." We are unpersuaded by these latter two contentions, and we specifically agree with the following articulation by Judge Judith E. Retchin in her order granting summary judgment on other grounds in the *LATA* case:

Defendants ... argue that because standing must be determined at the time of the filing of the lawsuit, the plaintiff does not have standing given that five heads of household had moved out of the building prior to the filing of the complaint, and three of five left the District of Columbia. Preliminarily, the fact that standing must be determined at the time the complaint was filed does not mean that the heads of household must have lived in the building at the time the complaint was filed. The statutory definition of "head of household" does not require the tenant to live in the building

11. All parties assume that the tenant organization must represent a majority of the heads of household in the housing accommodation "as of 90 days prior to the sale." In *Waterside,* we noted that "the trial court granted the Towers defendants' motion to dismiss for lack of standing because it concluded WTRA did not represent a majority of the heads of household that had resided in the housing accommodation *for at least ninety days prior to the date of the challenged transaction, as required by the Sale Act.*" 2 A.3d at 1087 (emphasis added).

at the time the lawsuit is filed. Nor does case law interpreting TOPA require the head of household to live in the building at the time the complaint is filed. Based on the foregoing, the [c]ourt would be inclined to find that plaintiff has standing to bring this lawsuit.

Judge Retchin's reading is supported by D.C.Code § 42–3405.11 (2001), which provides in pertinent part that "[t]he purposes of this chapter favor resolution of ambiguity by the hearing officer or a court toward the end of *strengthening the legal rights of tenants or tenant organizations to the maximum extent permitted by law.*" (Emphasis added.) Moreover, it is a matter of common knowledge that incumbents move out of apartment buildings and that new tenants move in. The construction urged on us by the owners would create uncertainty as to whether an association which qualifies for standing under the statute at the time that its members sustained legally cognizable harm retained its standing at subsequent times, and this would thwart the broad remedial purposes of the statute and the liberal construction mandated by § 42–3405.11.

The owners cite *Allman v. Snyder,* 888 A.2d 1161 (D.C.2005), for the proposition that a person who has moved out of an apartment building is no longer a tenant. The question in *Allman,* however, arose in an altogether different context. That case concerned the validity of an assignment of a tenant's rights, and we noted that at the time of the assignment, the assignors "were tenants, and they were residing at the Fourth Street Property." *Id.* at 1169. This language in the *Allman* opinion did not relate to the statutory definition of a "tenant organization," which is at issue here, and we do not believe that the opinion in that case has any bearing on the issue presently before us. Indeed, we think that here, as in *Khiem v. United*

*States,* 612 A.2d 160 (D.C.1992), *cert. denied,* 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993), the owners' argument "makes too much out of too little." *Id.* at 164. As we went on to explain in *Khiem:*

> In *Kraft v. Kraft,* 155 A.2d 910 (D.C. 1959), the court pointed out that:
>
>> It is well to remember that significance is given to broad and general statements of the law only by comparing the facts from which they arise with those facts to which they supposedly apply.
>
> 155 A.2d at 913. *See also Armour & Co. v. Wantock,* 323 U.S. 126, 132–33, 65 S.Ct. 165, 89 L.Ed. 118 (1944), where the Supreme Court aptly stated:
>
>> It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the order under discussion. *To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court.* General expressions transposed to other facts are often misleading.

(Emphasis added in *Khiem*). See also discussion, *infra,* in the last paragraph of Part III D, p. 32.

■ The record in the cases before us reflects that at the time of the alleged sale both the BTA and the LATA qualified as "tenant organizations" within the meaning of § 42–3401.03(18). Each of these associations demonstrated that it represented at least half of the qualifying heads of households at the time of the alleged sale. Even if tenants subsequently moved out of the buildings in question, so that the BTA and the LATA no longer represented a majority at the time that their lawsuits were instituted, this development did not under-

mine the standing of these two associations.

■ We conclude, however, that summary judgment for lack of statutory standing was correctly entered against the four associations other than the BTA and the LATA. None of the remaining four organizations provided evidence that it represented at least half of the qualifying heads of household. Viewing the record in each case, as we must, in the light most favorable to the party opposing summary judgment, and drawing every reasonable inference in that party's favor, *West End Tenants Ass'n v. George Washington Univ.*, 640 A.2d 718, 725 (D.C.1994), we are nevertheless satisfied, as a matter of law, that the four associations have failed to demonstrate the existence of a genuine issue of material fact as to whether they represented a sufficient number of tenants to qualify for standing. Specifically, with the exception of the BTA and the LATA, the associations have failed to show "that there is sufficient evidence supporting the claimed factual dispute to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* (quoting *Nader v. de Toledano*, 408 A.2d 31, 42 (D.C.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980)).

### B. *Associational Standing*

The associations contend that even if they do not qualify as tenant organizations under the statutory definition, they nevertheless have "associational standing" to represent their members. They claim that the trial courts in the five cases in which standing was held to be lacking erred in failing to recognize each plaintiff's associational standing.

If the position of the associations with respect to this issue were adopted, the result would be an incongruous one. Under that approach, an association which did not include a majority of the heads of household in an apartment building, as specified in § 42–3401.03(18), would nevertheless have the same right to represent the tenants as would an association that *did* qualify under the language of the statute. This would, for all practical purposes, render the statutory definition superfluous and a nullity. We need not decide, however, whether statutory standing and associational standing can simply coexist, with the latter applying to tenant organizations not qualifying under the former, for in this case the theory that the four associations that lack statutory standing nevertheless have associational standing is precluded by our case law.

■ "An organization has standing to sue when one of its members has standing." *Speyer v. Barry*, 588 A.2d 1147, 1160 n. 25 (D.C.1991). In *Friends of Tilden Park*, we explained the doctrine of associational standing as follows:

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). At least the first of these three conditions of associational standing is inherent in the constitutional "case and controversy" requirement. *See United Food & Commercial Workers Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555–556, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996).

806 A.2d at 1207. Under our precedents, the associations cannot satisfy the first of

these requirements, and their claims of associational standing therefore fail.

■ Concededly, this conclusion is not an obvious one. The statute provides, in pertinent part, that "an aggrieved owner, *tenant,* or tenant organization may seek enforcement of any right or provision under [TOPA] through a civil action in law or equity...." D.C.Code § 42–3405.03 (2001) (emphasis added). In *West End Tenants,* however, we explicitly held that once a tenants' association has been registered as the representative of the tenants, individual tenants lack standing to sue on their own behalf:

> The Tenants Association was joined in intervention by several individually-named tenants. The appeals of these individual-tenant appellants will be dismissed for lack of standing. D.C.Code § 45–1640 (1990 Repl.) specifies the manner in which negotiations must be conducted when a housing accommodation having five or more units is being sold. As a preliminary step to entering into a valid contract of sale with an owner, the tenants of such an accommodation must form a tenant organization registered with the Mayor. "Upon registration, the organization constitutes the sole representative of the tenants, and the [owner's] prior offer of sale is deemed an offer to the organization." D.C.Code § 45–1640(1) (1990 Repl.). D.C.Code § 45–1638 (1990 Repl.), which prescribes the statutory method of affording tenants the right to purchase, does not give the individual tenant an opportunity to negotiate with the owner or to purchase in the tenant's owner right. Accordingly, "if the conduct of an

owner gives rise to any basis for a civil action against the owner under § 45–1653, it is only the tenant organization that is 'aggrieved' as that term is used in § 45–1653 and, therefore, it is only the tenant organization that can bring a civil action against the owner under the statute." *Stanton v. Gerstenfeld,* 582 A.2d 242, 245 (D.C.1990).

*West End Tenants,* 640 A.2d at 721 n. 1.

In *Twin Towers Plaza Tenants' Ass'n v. Capitol Park Assocs., L.P.,* 894 A.2d 1113 (D.C.2006), the individual tenants contended that *West End Tenants* was wrongly decided, and that the dispositive footnote was *obiter dictum* and need not be followed. The court in *Twin Towers* disagreed, however, noting that "because [the discussion in the *West End Tenants* footnote] provided the analytical basis for dismissal of the appeals of the individual tenants, it could not be treated as dictum." *Id.* at 1117. The court added that it lacked authority

> as a division, [to] accept appellant's invitation to reconsider that holding. *See M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971) (only the en banc court may overrule the holding of a division of this court.).

*Id.*[12]

Without addressing the rule of *M.A.P. v. Ryan,* which, in our view, presents an insuperable obstacle to their claim, the associations assert that although the decisions in *West End* and *Twin Towers* "might have suggested a different result," both cases "involved a fundamental misunderstanding of the [c]ourt's earlier holding in *Stanton,* 582 A.2d at 245, and therefore should not

---

12. The court in *Twin Towers* stated that it "need not resolve [the] complicated question of associational standing." *Id.* Since the court followed the holding in *West End Tenants* that individual tenants lacked standing to sue, and since the existence of individual tenant standing is a precondition of associational standing, *Friends of Tilden Park,* 806 A.2d at 1207, the court in *Twin Towers* would necessarily have been obliged to reject the claim of associational standing if it had reached the question.

be followed." The associations urge us, instead, to follow *Redmond v. Birkel,* 797 F.Supp. 36, 39 (D.D.C.1992), a case in which the United States District Court stated that under TOPA, "[tenant] plaintiffs can sue individually to challenge the lack of notice [of a proposed sale]." In light of the rule of *M.A.P. v. Ryan,* however, the claim of associational standing can be sustained, if at all, only by the full court sitting en banc, and we are compelled to reject it here.

## III.

### WHETHER THE TRANSACTION WAS A SALE

Having concluded that two of the tenant associations have statutory standing to bring their suits, we now address the substantive question whether the owners were entitled to summary judgment on the ground that the transactions that occurred on June 30, 2004, considered together, were not a "sale" within the meaning of D.C.Code § 42–3404.02(a) as it read at that time. In light of our decision in *Waterside,* 2 A.3d 1084, which was issued after oral argument in these appeals, and which was the subject of supplemental briefing by the parties and by *amicus curiae,* we conclude that the transfers constituted a sale subject to the requirements of TOPA.

### A. *The Statute and Applicable Principles of Construction*

TOPA provides in pertinent part that before the owner of a housing accommodation may sell the accommodation, he or she is required to "give the tenant an opportunity to purchase the accommodation at a price and [on] terms which represent a *bona fide* offer of sale." D.C.Code § 42–3404.02(a) (2008). "At the time these suits were brought, [TOPA] did not explicitly define "sale." Rather, it left the meaning of the term to courts to determine, except that it specifically 'included' some transactions within the scope of the term." *Waterside,* 2 A.3d at 1085 (footnote omitted); *see also* discussion in Part II, p. 6, *supra.*[13]

As we have noted in our discussion of the associations' standing, TOPA is a remedial statute, and it is to be generously construed "toward the end of strengthening the legal rights of tenants or tenant organization to the maximum extent permitted under law." D.C.Code § 42–3405.11 (2008). In particular, as the Supreme Court explained almost a century ago in a different but relevant context, "the courts will not permit themselves to be blinded ... by mere forms ... but, regardless of fictions, will the substance of the transaction ... as the justice of the case may require." *Chicago, M. & St. P.*

---

**13.** In 2005, the statute was amended to "clarify that "the terms "sell" or "sale" include, *inter alia,*" the transfer of an ownership interest in a corporation, partnership, limited liability company, association, trust, or other entity which owns an accommodation as its sole or principal asset, *which,* in *effect, results in the transfer of the accommodation." See* D.C.Code § 42–3404.02(c) (2008), quoted in *Waterside,* 2 A.3d at 1086 n. 4. (Emphasis added.) The 2005 amendments thus broadened the statutory definition.

The associations contend that the 2005 amendments "clarified" prior law rather than amending it, and that their substance was

therefore in effect in 2004 and thus applicable to the present appeals. *See, e.g., Edwards v. Lateef,* 558 A.2d 1144, 1146–47 (D.C.1989) (stating that there is no contravention against retrospective application of a statute where the statute merely clarifies existing rights.) Although we would be hesitant to apply the 2005 amendments to transactions predating them, when these amendments did not explicitly provide for retrospective application, *see, e.g., West End Tenants,* 640 A.2d at 730–31, we need not resolve this issue, for we conclude that the transfers constituted a sale in 2004 without regard to the enactment of subsequent legislation.

*Ry. Co. v. Minneapolis Civic & Commerce Ass'n,* 247 U.S. 490, 501, 38 S.Ct. 553, 62 L.Ed. 1229 (1918). More recently, we have reiterated that "[c]ourts deal with the substance rather than the form of transactions and will not permit important legislative policies to be defeated by artifices affecting legal title but not the practical consequences of the existing situation." *EDM & Assocs., Inc. v. GEM Cellular,* 597 A.2d 384, 389 (D.C.1991) (quoting *United States v. Beach Assocs., Inc.,* 286 F.Supp. 801, 807 (D.Md.1968)); *accord, Tenants of 1255 New Hampshire Ave., N.W. v. District of Columbia Rental Hous. Comm'n,* 647 A.2d 70, 76–77 (D.C.1994). Specifically in reference to determining whether a transfer is a sale within the meaning of TOPA, we have stated that the court must look to the "true nature" of the transaction. *Wallasey Tenants Ass'n v. Varner,* 892 A.2d 1135, 1141 (D.C.2006). Moreover, we are of the opinion that TOPA, like other remedial statutory and constitutional provisions, "forecloses sophisticated as well as simple-minded modes of nullification or evasion." *Goodman v. District of Columbia Rental Hous. Comm'n,* 573 A.2d 1293, 1297 (D.C.1990) (citation omitted); *see also Lane v. Wilson,* 307 U.S. 268, 275, 59 S.Ct. 872, 83 L.Ed. 1281 (1939). We approach these appeals with the foregoing principles in mind.

B. *Case Law prior to Waterside*

Whether a particular transaction constitutes a sale within the meaning of TOPA has been the subject of much litigation. Our pre-*Waterside* case law on the subject was aptly summarized in our recent opinion in that case:

> We have held that a property transaction must involve "an 'absolute transfer' or amount to the passing of 'general and absolute title,' " in order to qualify as a sale under subjection (a) [ (citing *Twin Towers,* 894 A.2d at 1119 (quoting *West*

*End Tenants,* 640 A.2d at 727–28)) ]. We have established that the transfer of "a special interest falling short of complete ownership" does not qualify as a "sale" [citing *Twin Towers* and *West End Tenants* ]. Accordingly, in *West End* we held that a long-term lease with an option to buy was not a sale. And in *Twin Towers,* we concluded that a transfer of 95% interest in conjunction with a tenancy in common agreement was not a sale because it did not effect an "absolute transfer."

Importantly, in *Wallasey* we also held that a single-party conveyance to a limited liability company wholly-owned by the grantor for "no purpose other than to legitimately limit [the owner's] liability" was not a sale [882 A.2d at 1141]. Thus, *Wallasey* stands for the proposition that, even when a conveyance takes "the appearance of a sale," this court will not find a "sale" to have occurred if the transaction (1) does not involve arms-length bargaining with a third-party, and (2) changes only the form and not the substance of the ownership.

Subsequently, in *Gomez* [*v. Independence Mgmt. of Delaware, Inc.,* 967 A.2d 1276, 1283 (D.C.2009) ] we held that a transfer of absolute title from one wholly-owned company to a wholly-owned subsidiary could be a "sale" where the transaction also involved arms-length bargaining resulting in an agreement to sell 99% of the stock of the subsidiary company to a third party "in return for consideration of value." In doing so, we distinguished *Wallasey* because "the *entire transaction* [meaning the transfer of absolute title from one subsidiary to another, followed by the sale of the transferee's stock] was contemplated by, and carried out in accordance with, the Stock Sale Agreement." But, in *Alcazar* [*Tenants' Ass'n v. Smith Prop.*

*Holdings L.P.*, 981 A.2d 1202 (D.C. 2009)] a case with similar facts, we came to the opposite conclusion because we found dispositive the lack of an overarching agreement pursuant to which the parties undertook to complete the complex transactions that resulted in the transfer of ownership. [*Id.* at 1207 n. 3]

*Waterside*, 2 A.3d at 1088–89.

## C. *The Waterside Decision*

The Waterside Complex at issue in *Waterside* consisted of the Townhouses and the Towers,[14] which were located on separately-deeded parcels of real estate. In October 2003, Trilon Plaza Co. ("TPC"), which held title to the Townhouses in fee simple, entered into a contract with United Dominion Realty Trust ("UDRT") under the terms of which ownership of the Waterside complex was transferred to UDRT. No right of first refusal was accorded to the tenants. The parties' "Contribution Agreement" provided that TPC would create the Townhouses Trust, and that it would convey title to the Townhouses to the Trust. The sole beneficiary of the Townhouses Trust was to be Townhouses Holding Company, wholly owned by TPC. Finally, the Contribution Agreement provided that TPC would sell 95% of its interest in the Townhouses Holding Company to UDRT in return for approximately $50,000,000 at closing. All of these transactions were executed contemporaneously in December 2003. The association representing the residents of the Townhouses brought suit, contending that the transactions constituted a sale, and that the tenants had been denied notice and an opportunity to purchase, in contravention of TOPA.

The court ruled in *Waterside* that the conveyance of the Townhouses described above constituted a "sale" within the meaning of D.C. § 42–3404.02(a). The court noted that, because a contract "specifically provided for the transfer of 100% of TPC's interest in the Townhouses to the Townhouses Trust," it followed that "TPC's right to receive the proceeds of the sale of the Townhouses Holding Company was contingent on the initial transfer of fee simple title in the Townhouses from TPC to the Townhouses Trust." *Waterside*, 2 A.3d at 1089. Thus, neither *Twin Towers*, which involved a transfer of only a 95% interest in the property, nor *Wallasey*, in which there was no transfer of ownership to a third party, was controlling. *Id.* Viewing "the entire transaction as a whole," *id.*, we held in *Waterside* that the transfer constituted a "sale":

> We conclude that the conveyance of the Townhouses resulted in a "sale" under subsection (a). The "Contribution Agreement" compelled the transfer of TPC's entire interest in the Townhouses to the Townhouses Trust. TPC's promise to transfer absolute title was in exchange for valuable consideration flowing from UDRT to TPC. These facts lead to the conclusion that this conveyance was not a mere "restructuring" as in *Wallasey*. Rather, viewing the entire transaction as a whole like we did in *Gomez*, the transfer constituted a "sale" because TPC transferred absolute title in Townhouses to the Townhouses Trust as part of an agreement in which a third party, UDRT, would thereby gain an interest in the property. Because none of the facts upon which we base this conclusion are in dispute, we hold that,

---

**14.** The transactions as to the Towers, which were held not to constitute a sale, had an entirely different history, and the court's decision with respect to the Towers has no bearing on the instant appeals.

as a matter of law, TPC indeed "sold" the Townhouses under subsection (a). *Id.* at 1090. *Waterside* thus stands for the proposition that when the original owner of a rental accommodation transfers absolute title to another entity, and when he or she does so pursuant to an overarching agreement as a result of which a third party obtains an interest in the accommodation, then a sale has occurred for purposes of TOPA.

As we explained in *Waterside,* our earlier decisions in *Gomez,* in which we concluded that the transaction constituted a "potential sale," and in *Alcazar,* in which we reached a contrary conclusion, illustrate the proper application of the analysis adopted in *Waterside.* In *Gomez,* we held that a transfer of absolute title to an apartment building from one wholly owned entity to a wholly owned subsidiary could constitute a "sale" if the transaction involved arm's length bargaining, and if it resulted in an agreement to sell 99% of the stock of the subsidiary to a third party "in return for consideration of value." *Gomez,* 967 A.2d at 1283; *see also Waterside,* 2 A.3d at 1090 & n. 21 (discussing *Gomez* ). As we explained both in *Gomez* and in *Waterside, Wallasey* was inapposite in these circumstances because "the *entire transaction* [meaning the transfer of absolute title from one subsidiary to another, followed by the sale of the transferee's stock] was contemplated by, and carried out *in accordance with,* the Stock Sale Agreement." *Waterside,* 2 A.3d at 1089 (quoting *Gomez,* 967 A.2d at 1284) (emphasis and bracketed language added in *Waterside* ). Thus, in *Gomez* and *Waterside,* both the initial transfer of absolute title to an entity controlled by the original owner and the subsequent transfer of 95% to 99% of the owner's interest to a third party occurred pursuant to an overarching agreement be-tween the original owner and the third party. Under these circumstances, we held that the transfers in each case were "sales" (or, in *Gomez,* a potential "sale").

In *Alcazar,* on the other hand, the court held that the initial transfer of a rental accommodation from an individual owner to an entity controlled by that same owner, as part of a multi-step transfer, did not constitute a sale. As we explained in *Alcazar* and reiterated in *Waterside,* the dispositive difference between *Alcazar* and *Gomez,* in each of which the transaction included initial transfers of the apartment buildings to entities controlled by the original owners, was "the lack of an overarching agreement [in *Alcazar* ] pursuant to which the parties undertook to complete the complex transaction that resulted in the transfer of ownership." *Waterside,* 2 A.3d at 1089 & n. 17. *Alcazar,* 981 A.2d at 1207 n. 3. We explained that *Alcazar* differed from *Gomez* because in *Gomez,* "the . . . transaction was contemplated by, and carried out *in accordance with,* the Stock Sale Agreement, which spelled out the obligations of the parties." *Id.* at 1089.

The result in *Waterside* is consistent with the authorities holding that courts should treat transactions as a whole and should avoid exalting form over substance. We agree with *amicus curiae* that the *Waterside* decision "limit[s] the opportunities for gamesmanship—in which sellers of rental housing endeavor to devise increasingly ingenious mechanisms for circumventing [15] the Council's clear intent to protect tenants' opportunities to purchase their rental accommodations before owners may sell them."

### D. *Application of Waterside to the present appeals*

The record in the present case is, in our view, indistinguishable in principle from

---

15. As this court put it in *Goodman,* we should foreclose "sophisticated as well as simple-minded modes of nullification or evasion" of remedial statutes. 573 A.2d at 1297.

that in *Waterside*. Here, as in *Waterside*, the Bernsteins transferred absolute title to the buildings in question to wholly owned entities as part of an overarching agreement in which third parties—Carmel and, nominally, Quarry—acquired an interest in the property.

The real estate transaction which resulted in the transfer of the buildings at issue in this case was consummated on June 30, 2009 in accordance with the parties' comprehensive Purchase and Sale Agreement. This single Purchase and Sale Agreement dictated the terms of *both* steps of the transfer of the apartment buildings. It specified first, that "[i]mmediately prior to Closing," each of the LLC I entities "shall contribute" its properties to a subsidiary— *e.g.*, "Richman shall contribute the Richman Property to the Richman Subsidiary." The agreement provided that the transfers of the properties to the subsidiaries "shall be made in accordance with special warranty deeds, bills of sale, assignments and other instruments of conveyance," and that these instruments must be "approved as to their form and content by Purchasers (acting reasonably)." The sellers (the LLC I entities) agreed to sell 99.99% of their membership interests in these subsidiaries to Carmel and 0.01% to Quarry for $88,000,000 (later reduced to $83,000,000). The purchasers' obligation to close under the agreement, and to pay the agreed upon purchase price, was explicitly made subject to the "Sellers' performance of all of the covenants, agreement and obligations required to be performed under this Agreement." These obligations included the transfer of title from the LLC I entities to the "subsidiaries," as specified in the agreement.

Thus, pursuant to the Purchase and Sale Agreement, two transfers occurred for each building on June 30, 2004, the closing date. First, the Bernsteins transferred by special warranty deed, from the LLC I entities to the related LLC II entities (the "subsidiaries" contemplated by the Purchase and Sale Agreement), a 100% fee simple ownership interest in each building. Second, the LLC I entities sold 99.99% of their membership interests in the LLC II entities to Carmel and 0.01% to Quarry. The Resolutions adopted by the members of the LLC I entities (the sellers), confirm that both (a) "the conveyance, in accordance with the terms of such Agreement, of all real and personal property owned by the Company" to the LLC II entities, and (b) "the conveyance of all membership interests in and to" the subsidiaries (the LLC II entities) "by the Company to the Purchasers" were necessary steps to consummate a single transaction—referred to in the Resolutions as "collectively, the Transaction"—under which the properties were sold by the LLC I entities controlled by the Bernsteins. After the transaction closed, the LLC I entities no longer owned any interest in the apartment buildings. As the "sellers," however, the LLC I entities—and thus, for all practical purposes, the Bernsteins—received the $83,000,000 purchase price paid by the transferees.

In our view, this two-step conveyance of the apartment buildings is analogous in all material respects to the transfer of the Townhouses that the court held to be a "sale" in *Waterside*. In that case, the Contribution Agreement required the transfer of TPC's "entire interest" in the Townhouses to the Townhouses Trust. 2 A.3d at 1086–87. Similarly, in the *Richman Towers* cases, the Purchase and Sale Agreement provided for the transfer of the "entire interest" of the LLC I entities in the apartment buildings to the LLC II entities. In *Waterside*, the recipient of the initial transfer, the Townhouses Trust, was an entity owned and controlled by TPC, the seller. So, too, in the *Richman Towers* cases, the recipients of the

initial transfer, the LLC II entities, were owned and controlled by the Bernsteins. In *Waterside*, the court concluded that TPC received valuable consideration for its promise to transfer absolute title to the Townhouses Trust, because TPC's right to receive the proceeds of the sale was contingent on that initial transfer of fee simple title from TPC to the Trust. Likewise, in the *Richman Towers* case, the LLC I entities received valuable consideration for their promise to transfer absolute title to the LLC II entities, because the right of the LLC I entities to receive the $83,000,000 in proceeds of the sale was contingent on the initial transfer of fee simple title.

Viewing "the entire transaction as a whole," as we did in *Waterside*, 2 A.3d at 1089, we conclude that the transfer here constituted a "sale" because the LLC I entities "transferred absolute title" in the apartment buildings to the LLC II entities "as part of an agreement in which a third party"—here, Carmel—"would thereby gain an interest in the property." *Id.* At the end of the day on which the parties closed in *Waterside*, TPC, the seller, no longer owned the property, and it had received the proceeds of the sale from a third party. Similarly, in the *Richman Towers* cases, after the closing on June 30, 2004, the LLC I entities (the sellers) no longer owned the properties, and they had received the purchase price from a third party. The "two defining characteristics of a sale under subsection (a) are (1) the passing of general and absolute title (2) in exchange for consideration." *Waterside*, 2 A.3d at 1090 n. 21 (citing *Gomez*, 967 A.2d at 1282). We are satisfied that each of these "defining characteristics" is present here.

The owners contend that the first transfers in *Richman Towers* cases differ from the first transfer in *Waterside* because the

Bernsteins transferred title for each property from the LLC I entities, which they owned and controlled, to the newly formed LLC II entities, which they also owned and controlled, and that the Bernsteins did so for their own tax and estate purposes, and for no consideration. However, in *Waterside*, absolute title to the Townhouses was transferred from the original seller, TPC, to a trust owned and controlled by the original seller, TPC. We discern no legally significant difference.

Further, in asserting that there was no consideration for the initial transfer from the LLC I to the LLC II entities, the owners treat that transfer in isolation, rather than "viewing the entire transaction as a whole," as *Waterside* instructs, 2 A.3d at 1090. In *Waterside*, the contract specifically provided for the transfer of 100% of TPC's interest in the Townhouses to the Townhouses Trust, leading the court to conclude that "TPC's right to receive the proceeds of the sale of the Townhouses Holding Company was contingent on the initial transfer of fee simple title in the Townhouses from TPC to the Townhouses Trust." *Id.* Accordingly, in making the transfer, TPC received "valuable consideration" that flowed from the third party, UDRT to TPC. *Id.* The same is true here. The Purchase and Sale Agreement specifically provided for the transfer of absolute title to the apartment buildings from the LLC I to the LLC II entities, and consummation of the entire agreement was made subject to the performance of that obligation. In this case, as in *Waterside*, the transaction as a whole was supported by ample consideration.

But, say the owners,

> The [f]irst [t]ransfers here were critically different from those at issue in *Gomez* and *Waterside* because the [f]irst [t]ransfers were not a necessary element of the Bernsteins' transfers to third par-

ties (Carmel Partners and Quarry). Carmel Partners and Quarry could have purchased the membership interests of the LLC I Entities without the Bernsteins transferring absolute title from the LLC I Entities to the LLC II Entities. In other words, had the [f]irst [t]ransfers not occurred, the substance and the results of the transaction would have been the same. By contrast, in *Gomez* and *Waterside*, the first transfers there were necessary for the contemplated transaction to be completed. In *Gomez*, the housing accommodation needed to be isolated from other assets so that only the relevant apartment building could be transferred. In *Waterside*, the absolute deed to the building was owned by a limited partnership, but the parties had contemplated transferring ownership through a trust structure in order to avoid the Sale Act. The property in *Waterside* had to be transferred to a trust for the parties to close the contemplated transaction.

The [f]irst [t]ransfers here are materially different. Based on the uncontroverted record below, the only reason those transfers occurred was for the Bernsteins' own business convenience—that is, tax and estate purposes. There was no need to place assets into the LLC II entities for the contemplated transaction to close. Accordingly, the first transfers were corporate restructuring without consideration and not "sales."

Therefore, according to the owners, it is *Wallasey*, not *Gomez* or *Waterside*, that controls these appeals, and because the stated purpose of the first transfers was "estate planning" and "tax restructuring," the transaction was not a sale.

The owners' argument is a creative one, but we do not believe that it can carry the day. First, there is nothing in the opinions in *Gomez* or *Waterside* that makes the outcome of those cases turn on the factors suggested by the owners—the purported need for "isolation of assets" in *Gomez* or the contemplated "trust structure" in *Waterside*. It was the presence in *Gomez* and *Waterside* of an "overarching agreement" which, taking the record as a whole, resulted in a transfer to a third party for consideration, that distinguishes these cases from, *e.g.*, *Wallasey* and *Alcazar*, where there was no comparable agreement.

Second, the assertion that the transaction with Carmel (and, minimally, with Quarry) "could have been" carried out without the first transfers having taken place is, in our view, essentially irrelevant. We are not concerned here with a scenario that did not occur.[16] Here, the Purchase and Sale Agreement—a single contract

---

**16.** Even if the Bernsteins had transferred the properties directly to the transferees—99.99% to Carmel and 0.01% to Quarry—it is not as clear as the owners suggest that the transaction would not be a sale. We held in *Twin Towers* that transfer of a 95% interest was not a sale and indicated in *Gomez* that 99% was not enough. But although the transfer of a 100% interest is required, there must surely be some point at which common sense intervenes.

Suppose, for example, that Quarry, which obviously existed only for the purpose of avoiding coverage of the transaction under TOPA, had received an interest only of ten dollars, or a single dollar, or a dime, or a penny, would this still have turned what would otherwise have been a sale into a non-sale, and resulted in the denial to the tenants of the right under a remedial statute that by its own terms is to be generously construed, to notice and to an opportunity to purchase? If the answer to this question would be yes even if Quarry's interest were a nickel, then surely such a result would be absurd. Given our disposition of the appeals on other grounds, we need not decide here when, if ever, under all of the circumstances, a percentage nominally less than 100% becomes 100% in substance though not in form.

that governs both parts of a single "Transaction" carried out on the same day—explicitly made the transferees' obligation to pay the purchase price on the due execution of the first transfers in a form that must be acceptable to the transferees. This would not have been true in the owner's hypothetical.

Third, the owners' reliance on *Wallasey*, although thoughtfully crafted, necessarily fails. In *Wallasey* there was no agreement to transfer the properties to a third party, and the decision in that case did not anticipate, nor did it purport to address, such a situation. *Wallasey* could control only if we were to disregard *Waterside's* common sense directive that we view the entire transaction as a whole. The owners also argue that in *Gomez* and *Waterside*, it was essentially acknowledged by the sellers that the transaction had been structured in order to avoid the reach of TOPA. This case is different, according to the owners, because there was uncontradicted deposition testimony to the effect that the first transfers were effected for tax and restructuring purposes. We note first that the intentional structuring of a transaction so that TOPA will not apply does not render TOPA applicable if the transaction does not run afoul of the statute as written. But in any event, there can be no question that in the cases now before us, the intent of the transferor and transferee was to ensure that TOPA would not apply. To suggest that the creation of a 0.01% interest in Quarry was designed for any other purpose than to avoid a transfer of a 100% interest to a single buyer (and thus, the owners hoped, to avoid the requirements of TOPA) taxes our credulity.

The owners remind us that "[i]t is of particular importance to guard against the danger of stating propositions of law in wider terms than is necessary, lest essential factors be omitted and the inherent adaptability of law be unduly restricted." (Quoting Lord Akin of the House of Lords in *Donoghue v. Stevenson,* [1932] A.C. 562, 584 (H.L.)); *see also Roscoe Pound, Survey of Conference Problems,* 14 U. OF CIN. L.REV. 324, 330–31 (1940). They suggest that the language in *Gomez* and *Waterside* on which we have relied was written in the context of the facts in those cases, and may not be carried over to the allegedly different circumstances of the present appeals. We generally agree with the legal proposition asserted by Lord Akin and Dean Pound—indeed, we have made essentially the same point in Part II A of this opinion, citing *Khiem,* 612 A.2d at 164—but we do not believe that it can fairly be applied here. For the reasons previously stated, we are of the opinion that the dispositive facts giving rise to these appeals are indistinguishable in principle from those in *Waterside,* and we have no hesitation in following *Waterside* here.

## IV.

## APPLICABILITY OF TOPA TO ALL SALES

### A. *Background*

Finally, we address the owners' broadest argument, raised for the first time on appeal, that a seller's obligations under TOPA arise only if the sale of an accommodation is for purposes of demolition or discontinuance of housing use. This issue, as we have noted, is one of first impression.

We begin by quoting in its entirety the TOPA provision upon which the owners base this contention:

Before an owner of a housing accommodation may sell the accommodation, or issue a notice of intent to recover possession, or notice to vacate, *for purposes of demolition or discontinuance of housing use,* the owner shall give the tenant

an opportunity to purchase the accommodation at a price and terms which represent a bona fide offer of sale.

D.C.Code § 42–3404.02(a) (2001) (emphasis added). Primarily on the basis of the placement of commas before and after the phrase that we have italicized, the owners contend that the transactions in these cases were not subject to TOPA because even if the transfers were sales, they were not "for the purpose of demolition or discontinuance of housing use." They contend that the punctuation in the provision compels the conclusion that TOPA was not violated.

The owners further argue that their proposed construction of the statute is consistent with its stated purposes of "discourag[ing] the displacement of tenants through conversion or sale of rental properties" and to "preserve rental housing which can be afforded by lower income tenants." They claim that the transfers in these cases were ultimately from one landlord to another, that each rental unit was maintained as a rental unit, and that the transactions therefore did not impede or interfere with the statutory purposes. The owners also assert that if TOPA is construed as applying to sales which are not for the purpose of demolition or discontinuance of housing use, and which therefore do not adversely affect the availability of affordable rental housing, then the statute runs afoul of U.S. Const. art. 1, § 10, cl. 1 ("No state shall ... pass any ... Law impairing the Obligation of Con-

tracts") and effects an unconstitutional redistribution of wealth.[17]

So far as we can determine, the owners did not raise their claim that TOPA is limited to demolition/discontinuation scenarios in any of the cases before the Superior Court, and the issue is presented for the first time on appeal. This court may affirm a judgment, however, upon any legally sound ground, provided that there has been no procedural unfairness and that the opposing party has been afforded an adequate opportunity to contest the issue on which the appellate ruling is based. *1137 19th St. Assocs., Ltd. P'ship v. District of Columbia,* 769 A.2d 155, 161 (D.C.2001); *Sheetz v. District of Columbia,* 629 A.2d 515, 519 n. 5 (D.C.1993). Following oral argument in the appeals now before us, the court requested the parties, and invited potential *amici curiae,* to file supplemental briefs addressing the owners' claim described above. "Both parties have now had the opportunity to brief the issue, and we therefore believe that it is appropriate for us to decide [it]." *Martin v. United States,* 952 A.2d 181, 189 (D.C. 2008); *see also Outlaw v. United States,* 632 A.2d 408, 410 & n. 7 (D.C.1993).

The question before us is one of statutory construction, *i.e.,* one of law, and our review is therefore *de novo. Wemhoff v. District of Columbia,* 887 A.2d 1004, 1007 (D.C.2005).[18] We note at the outset that the only court that has passed on the issue directly has rejected the narrow interpretation of TOPA here proposed by the owners, namely, that the only sales subject to

---

**17.** According to the owners, "[w]hile preserving rental housing is a significant and legitimate public purpose, simply transferring wealth from owners to tenants is not." The owners go on to state that any reading of TOPA broader than the one for which they argue would constitute "a disguised tactic to assist in redistribution of wealth that infringes on the property rights of owners and is not

centered around any legitimate public policy."

**18.** In any event, the question presently under discussion was not raised in the Superior Court in any of the six cases, and there is thus no trial court interpretation of this provision of the statute to which any deference or weight could be accorded.

TOPA are those for purposes of demolition or discontinuance of housing use. *See Redmond,* 797 F.Supp. at 37–38.[19] Further, this court has repeatedly stated, without ever mentioning any demolition/discontinuance limitation, that "before the owner may sell a housing accommodation, it must give the tenant (or tenants) notice and an opportunity to purchase the accommodation at a price and on terms which represent a *bona fide* offer of sale." *Twin Towers,* 894 A.2d at 1115; *accord, e.g., Alcazar,* 981 A.2d at 1206; *Gomez,* 967 A.2d at 1282; *1836 S St. Tenants Ass'n v. Estate of Battle,* 965 A.2d 832, 838, 840 (D.C.2009); *see also West End Tenants,* 640 A.2d at 721–32 (deciding the question whether a master lease constituted a sale, and implicitly assuming for that purpose that all sales were subject to TOPA).

Nevertheless, this court has never had occasion to consider the issue whether the reach of TOPA is limited in the manner that the owners suggest. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925); *Murphy v. McCloud,* 650 A.2d 202, 205 (D.C.1994) (quoting *Webster* ). "[T]he rule of *stare decisis* is never properly invoked unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question." *District of Columbia v. Sierra Club,* 670 A.2d 354, 360 (D.C.1996) (quoting *Murphy,* 650 A.2d at 205).

### B. *The statutory language*

"We start, as we must, with the language of the statute." *Bailey v. United States,* 516 U.S. 137, 144, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). As our en banc court has stated, "[t]he primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C.1983) (en banc) (citation and internal quotation marks omitted). However, as Judge Learned Hand has written, "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary." *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945); *see also James Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 45 (D.C.1989) (quoting *Cabell* ). Accordingly, we must be "mindful that our interpretation is not at variance with the policy of the legislation as a whole, requiring that we remain more faithful to the purpose than the word." *Jeffrey v. United States,* 892 A.2d 1122, 1128 (D.C.2006) (citation and internal quotation marks omitted).

The text of the provision here at issue is reproduced on page 33, *ante.* The sole ambiguity, if there is one, is whether the phrase "for demolition or discontinuance of housing use," which is set off by commas, modifies the words "sell the accommodation," as well as one or both of the other two kinds of transactions to which the statute refers.

The owners assert that the commas before and after the key phrase demonstrate beyond doubt that the limiting language applies to the sale of an accommodation. For the reasons set forth below, however, we conclude that the punctuation is not dispositive, that the owners'

---

**19.** The owners make no attempt to distinguish *Redmond,* but they correctly note that we are not bound by that decision. They assert that the *Redmond* was erroneously decided.

proposed construction essentially nullifies the words "sell the accommodation" and leads to irrational results, and that the overall historical context, as well as the specific history of TOPA's enactment in 1980, conclusively demonstrate that the statute, read as a whole and in light of related provisions, is not limited to sales for the purpose of demolition or discontinuance of housing use. We are likewise unpersuaded by the owners' claim that if their construction of TOPA is rejected, the statute is unconstitutional.

## C. *Historical context*

As Justice Holmes has written, "[u]pon this point, a page of history is worth a volume of logic." *New York Trust Co. v. Eisner,* 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921). In order to resolve the question of statutory construction raised by the owners, and especially in order to understand the origins of the punctuation on which they principally rely, it is necessary to put the enactment of TOPA in 1980 into its historical context.

In passing this legislation, the Council was not writing on a clean slate. Rather, TOPA was enacted against the backdrop of existing law, which required owners of certain rental housing accommodations to provide their tenants with an opportunity to purchase before the owners sold the property to third parties. In 1975, the Council began with the requirement that an owner of a single-family housing accommodation must provide the tenant with an opportunity to purchase before the owner would be permitted to sell the accommodation, regardless of the purpose of the sale. D.C. Law 1–33, § 301, D.C.Code § 45–1661 (Supp.IV, 1973–1977). In 1977, the Council significantly expanded the scope of this requirement. D.C. Law 2–54, §§ 601–602, D.C.Code § 45–1699.8, .9 (Supp.VI, 1978–79). It is undisputed and, indeed, indis-

putable, that prior to 1980, the law providing tenants with the opportunity to purchase was not restricted to sales for the purposes of demolition or discontinuance of housing use.

The enactment of TOPA in 1980 was not designed to curtail the rights of tenants. "There is nothing to suggest that [when TOPA was enacted] the legislature intentionally changed the applicability of the statute," *Redmond,* 797 F.Supp. at 38, or intended in any way to restrict its scope. On the contrary, the purpose of the 1980 statute was to maintain and enhance the rights of tenants. Indeed, the Council explicitly recognized the need to do so. *See, e.g.,* D.C. Law 3–86, §§ 101(a) ("There is a continuing housing crisis in the District of Columbia.") & 101(b) ("There is a severe shortage of rental housing available to the citizens of the District of Columbia."), D.C.Code § 42–3401(a)(1) & (2). The Council enacted the RHCSA, including TOPA, to discourage the displacement of tenants, to strengthen tenants' bargaining position, to preserve affordable rental housing, to encourage the formation of tenant organizations, and to serve several other purposes specified in the Act. *See* D.C. Law 3–86, § 102, D.C.Code § 42–3401.02.

Since the owners cannot and do not claim that any demolition/discontinuance limitation of tenants' opportunity to purchase existed before 1980, their argument must necessarily rest on the theory that in enacting TOPA in that year, the Council intended to place on the rights of tenants a severe limitation that had not been in effect under prior law. Significantly, however, no such intention was disclosed by or mentioned in TOPA's legislative history, nor, indeed, so far as the record discloses, was such a purpose suggested by any proponent of TOPA before (or since) its enactment. "In a case where the construction of legislative language such as this makes

so sweeping and so relatively unorthodox a change as that made here, [we] think judges as well as detectives may take into consideration the fact that a watchdog did not bark in the night." *INS v. St. Cyr*, 533 U.S. 289, 320 n. 44, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (quoting *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 602, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980) (Rehnquist, J., dissenting)); *see also* ARTHUR CONAN DOYLE, *Silver Blaze: The Complete Sherlock Holmes* 335 (1927), cited in *Chisom v. Roemer*, 501 U.S. 380, 396 n. 23, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). A legislature "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). In *Covington v. United States*, 698 A.2d 1033 (D.C.1997), we observed that although "[a] change in legislative language gives rise to the presumption that a change was intended in legislative result," it is "unlikely that the Council would have enacted a major expansion of the availability of preventive detention in witness intimidation situations without any debate or explicit consideration whatever." *Id.* at 1036 n. 6 (citation omitted). This analysis obviously makes sense here; the Council would not severely curtail the rights of tenants without anyone so much as saying a word on the record about such a dramatic change. In this instance, as we shall see, there was no occasion for the dog to bark or for an elephant to be hidden, for no dramatic (or other) dilution of tenants' rights was being contemplated.

### D. *Legislative history of the 1980 Act*

In this case, we think it appropriate to set forth TOPA's legislative history in some detail because, in our view, that history demonstrates beyond any doubt that the language and punctuation on which the owners rely was not intended to bring about the result which they ask us to reach. Indeed, this is one of the comparatively rare instances in which the legislative history conclusively demonstrates what the statutory language was designed to mean, and it specifically discloses how it came to pass that the commas are located where they now are.

The story begins in 1979, when Bill 3–222, which was to become the RHCSA, was introduced in the Council. The initial version of the proposal set forth as follows the circumstances under which owners of housing accommodations would be required to afford tenants an opportunity to purchase:

> Sec. 402. *Existence of Tenant Opportunity to Purchase*. Before an owner of a housing accommodation may
>
> (a) sell the accommodation;
>
> (b) issue a notice of intent to recover possession for purposes of discontinuance of housing use or demolition;
>
> (c) issue a notice of intent to recover possession for purposes of conversion to condominium or cooperative form of ownership; or
>
> (d) issue a notice to vacate on account of sale, discontinuance of housing use, or demolition;
>
> the owner shall give the tenant an opportunity to purchase the accommodation at a price and terms which represent a bona fide offer of sale.

Bill 3–222, § 402 (Nov. 13, 1979), appended to D.C. Council, Comm. On Hous. & Econ. Dev., Report on Bill 3–222 (May 13, 1980) ("Committee Report"). In subsection (d), the bill thus proposed to add, for the first time, a requirement that the tenant be afforded an opportunity to purchase when the owner issued a notice of intent to recover possession or a notice to vacate for purposes of demolition or discontinuance

of housing use. The text of the bill, as introduced, unambiguously provided, in sub-section (a), that a tenant's opportunity to purchase was to apply to sales of housing accommodations. The absence of any qualification or exception in sub-section (a) demonstrates, at least in the absence of a compelling contrary showing, that the proposed bill would apply to *all* sales.

The new demolition/discontinuance language was, however, dropped from the "Committee Print" version of Bill 3–222, which provided quite simply:

> Sec. 402. *Existence of tenant opportunity to purchase.* Before an owner of a housing accommodation may sell the accommodation, the owner shall give the tenant an opportunity to purchase the accommodation at a price and terms which represent a bona fide offer of sale.

Bill 3–222, Comm. Print (May 13, 1980). This abbreviated text focused on the provision's central purpose—to ensure that before an owner may sell a housing accommodation, regardless of his or her reasons for doing so, the owner must give the tenant an opportunity to purchase. That central purpose was expressly confirmed in the Committee Report.[20] Neither the text nor the Report restricted in any way the sales which were to be covered.

When Bill 3–222 came to the Council for its first reading, however, Councilmember John L. Ray introduced an amendment which would have reinserted the language of § 402 as originally introduced. Mr. Ray proposed that after the words "may sell the accommodation," the Council insert in the Committee Print version of § 402 the words *"or issue a notice of intent to recov-er possession or notice to vacate for purposes of demolition or discontinuance of housing use."* (Emphasis added.) If this amendment had been adopted, § 402 would have read as follows:

> Sec. 402 *Existence of tenant opportunity to purchase.* Before an owner of a housing accommodation may sell the accommodation, *or issue a notice of intent to recover possession or notice to vacate for purposes of demolition or discontinuance of housing use,* the owner shall give the tenant an opportunity to purchase the accommodation at a price and terms which represent a bona fide offer of sale.

(Language proposed by Mr. Ray emphasized.) Councilmember Ray explained his proposed amendment as follows:

> What this amendment does is to reestablish that principle [from the bill as first introduced] of allowing the tenants to *not only purchase the building where the owner is putting the building up for sale,* but also where the owner is planning on demolishing the building or discontinuing the use of the building as housing.

(Emphasis added.) The text of the proposed amendment, as well as Mr. Ray's explanation, left no doubt that the phrase "for purposes of demolition or discontinuance of housing use" did not restrict the words "may sell the accommodation," and, indeed, that it was altogether unrelated to those words.

Mr. Ray's proposed language, however, did not make it entirely clear whether the words "for purposes of demolition or discontinuance of housing use" modified the

---

20. *See, e.g.,* Committee Report at 5 ("Title IV requires the owner with an intent to sell his accommodation to a third party, to first offer the accommodation to the tenant or tenants. This Title continues the policy of the Council of preventing displacement by giving the ten-ants an opportunity to purchase their homes."); *id.* at 7 ("Sec. 402. This section requires the owner prior to sale of the accommodation to a third party to first make a bona fide offer of sale to the tenants.").

words "issue a notice of intent to recover possession," which were not the immediately preceding antecedent. Some members of the Council were concerned that the proposed amendment, as drafted, might be construed to require an owner to accord a tenant an opportunity to purchase even if the owner proposed to occupy the unit personally. D.C. Council, Legislative Session at 109–12 (June 3, 1980). Councilmember David Clarke insisted that the point "needs to be clarified. I don't think we ever meant that if a guy wanted to take the unit or a single family house or whatever, to live in it that they [sic] had to offer it for sale to the tenants before they [sic] could move into it." *Id.* at 111.

In order to resolve any perceived ambiguity, the Council's General Counsel suggested that putting "some commas around 'or notice to vacate' might make it clearer" that the "notice of intent to recover possession" refers only to such notices issued for purposes of demolition or discontinuance of housing use. *Id.* at 111–12. Mr. Clarke proposed, as an alternative, that the Council simply strike the words "a notice of intent to recover possession" because the substance of that phrase was already included in the phrase "or issue a notice to vacate." *Id.* at 112. Ultimately, however, he accepted the commas instead. *Id.*

To implement Mr. Ray's proposal, while still accommodating the concerns of his colleagues that an owner should be permitted to occupy his or her own accommodation without first offering to sell it to the tenant, the words "... or issue a notice of intent to recover possession, or notice to vacate, for purposes of demolition" were inserted into the revised amendment. *Id.* at 113–14. As the General Counsel explained: "[T]hen it would be clear that the notice of intent to recover possession also is for purposes of demolition." *Id.* at 114.

This amendment, as modified, was adopted by the Council and became § 402 of the Act. It has remained unchanged ever since.

Nowhere in the Council's consideration of the proposed legislation was there any suggestion that the language relating to demolition or discontinuance of housing use, or the commas proposed by the General Counsel, would affect the applicability of the statute to all sales. The drafting history thus establishes to our satisfaction that the phrasing and punctuation of D.C.Code § 42–3404.02(a) came about because the Council intended to make it clear that only notices of intent to recover possession "for purposes of demolition or discontinuance of housing use" (and not notices of intent to recover possession for other purposes, such as occupancy by the owner) would trigger the tenant's opportunity to purchase. Thus, the words and the commas on which the owners rely were not placed where they are in order to limit in any way *sales* that would trigger tenants' rights. Indeed, no such dramatic restriction of coverage was proposed or mentioned by anybody.

### E. *Reliance on punctuation*

The foregoing legislative history demonstrates beyond peradventure that the Council had no intention in 1980 of limiting tenants' rights to purchase when an owner sought to sell an accommodation. The owners, nevertheless, argue that "because the emphasized phrase—"*for purposes of demolition or discontinuance of housing use*"—is offset by commas, this limitation "modifies each and every preceding clause, not just the [immediately] preceding clause." *See, e.g.,* 2A NORMAN J. SINGER & J.D. SHAMBIE SINGER, *Sutherland Statutory Construction*, § 47.33, at 491–92 (2007) ("Evidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the preceding one may be found in

the fact that it is separated from the antecedents by a comma"); *cf. Hargrove v. District of Columbia,* 5 A.3d 632, 634 (D.C. 2010) (explaining the rule of the last antecedent). If the placement of this comma were the *sole* evidence of legislative intent, the owners' position might not be implausible, although as we show below, the statute as so construed would not be workable. But in this instance, in addition to the legislative history summarized above, which in this case is surely dispositive alone, there is also other compelling evidence that the Council did not intend the provision to mean what the owners claim that it means.

 The proper construction of a writing does not begin and end with the placement of a comma. "A misplaced comma cannot be used to distort the meaning of a statute." 2A *Sutherland,* § 47.15, at 345. "No more than isolated words or sentences is punctuation alone a reliable guide for discovery of a statute's meaning." *United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993). Indeed, as this case surely demonstrates, "[a] purported plain meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting the statute's true meaning." *Id.* at 454, 113 S.Ct. 2173. It has long been recognized in this jurisdiction that "[p]unctuation is a most fallible standard by which to interpret a writing; it may be resorted to when all other means fail; but the court will first take the instrument by its four corners, in order to ascertain its true meaning." *MacFarland v. Elverson,* 32 U.S.App.D.C. 81, 87 (1908) (citation omitted). We turn to those four corners.

F. *Giving effect to every provision*

 "[S]tatutory meaning is to be derived, not from the reading of a single sentence or section, but from consideration of an entire enactment against the backdrop of its policies and objectives." *Dorchester House Assocs. Ltd P'ship v. District of Columbia Rental Hous. Comm'n,* 938 A.2d 696, 702 (D.C.2007) (citation omitted); *see also Hargrove,* 5 A.3d at 635 n. 11. "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Hibbs v. Winn,* 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004) (quoting 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 46.06, at 181–86 (rev. 6th ed.2000)). In *1836 S Street Tenants Ass'n,* 965 A.2d at 838, we applied this canon to the very statute at issue here, explaining that "[w]e must, of course, read TOPA as a whole and resist any construction of its words [21] that would render part of the statute a nullity." In our view, the owners' construction of TOPA effectively renders inoperative the words "sell the accommodation," which are among the most important words in the entire statute, if not *the* most important.

The owners assert, as we have seen, that the placement of commas before and after the phrase "for purposes of demolition or discontinuance of housing use" reflects a legislative judgment that TOPA shall apply to a sale only if the sale is for one of these purposes. Under the defendants' theory, TOPA's obligations therefore arise in three situations, namely, when an owner of a housing accommodation

1. sells the accommodation for purposes of demolition or discontinuance of housing use; or

2. issues a notice of intent to recover possession for purposes of demolition or discontinuance of housing use; or

---

21. Or, in this case, of its punctuation.

3. issues a notice to vacate for purposes of demolition or housing use.

It is undisputed that in all three of these situations, the tenants must be provided with notice of an opportunity to purchase at a fair price. But if the accommodation is a sale (as in situation No. 1), then it necessarily follows that before demolition of the accommodation or discontinuance of housing use can be carried out, *the purchaser*, as the party discontinuing rental use, will be obliged to provide the tenants with that notice and opportunity. In other words, if a sale to a third party is for the purpose of demolishing the premises or for discontinuing its use as housing, then that third party, *i.e., the purchaser* (as the party who proposes to demolish or discontinue) is responsible under the statute for providing a notice to the tenants and an opportunity to purchase, as specified therein. Indeed, it is difficult to understand how an owner could ever sell an accommodation "for purposes of demolition or discontinuance of housing use," for it would be the *buyer*, and not the seller, who would have the ability to carry out the demolition or to discontinue the use of the accommodation as housing, and it would therefore be the buyer, and not the seller, who would have to provide notice and opportunity to purchase to the tenants if the buyer decided to adhere to that plan. A construction of the statute which imposes an obligation on the seller on the basis of actions that must necessarily be taken by the buyer is unreasonable.

Further, it is difficult to discern what, if any, rational purpose would be served in such a situation by also requiring the seller to provide a notice and an opportunity to purchase when the buyer is the principal actor in the transaction affecting the tenants, and when the buyer must therefore give that notice and opportunity to them prior to demolishing the accommodation or discontinuing its use as housing. It

is surely unreasonable to suggest that both the seller and the purchaser must provide the same notice and opportunity. Moreover, in many if not most cases, the seller may not be in a position to know whether or not the purchaser proposes to continue to use the premises as rental housing, and it makes no sense, in such a situation, to impose the obligation on the seller to inform the tenants of facts of which the seller is unaware.

If the inclusion in the statute of the words "sell an accommodation" is to have any practical consequence, then those words must necessarily refer to a situation in which there will be no automatic obligation on the part of the buyer to provide notice and opportunity. That situation can arise only if the sale to the buyer is *not* for the purpose of demolition or discontinuance of housing use. Accordingly, as the Legal Aid Society states in its *amicus* brief,

> the term "sell," as limited by appellees, has no function to perform: TOPA rights, on appellees' reading, depend entirely on the issuance of a notice to vacate/intent to recover possession for purposes of demolition or discontinuance of housing use. If that is what the Council intended, years of litigation over what constitutes a "sale" could have been avoided, and the Council could have saved itself the trouble of amending § 42–3404.02 several times to add and amend subsections (b) and (c) to clarify the meaning of "sell" and "sale."

Moreover, since 1980, the Council has repeatedly amended TOPA to *expand* the definition of a "sale." Each of these amendments would have been a "pointless frolic," to quote the Legal Aid Society's brief, if the only sales that triggered TOPA rights were those for purposes of demolition or discontinuance of housing

use. *See, e.g.,* D.C.Code § 42–3404.02(b) & (c), as adopted in and amended by D.C. Law 8–49 (1989); D.C. Law 10–144 (1994); D.C. Law 10–176 (1994); D.C. Law 11–31 (1995); D.C. Law 16–15 (2005). For example, in 1995, the Council added subsections (b) and (c), which, among other things, potentially treat a "master lease" as a "sale" which is subject to a tenant's opportunity to purchase. D.C.Code § 42–3404.02(b) & (c). That change would be of no consequence if the owners' construction were correct, for it is difficult to imagine how a "master lease" for a housing accommodation could ever be a "sale" for purposes of demolition or discontinuance of housing use. Further revisions were enacted in 2005 and 2008, see annotation to D.C.Code § 42–3404.02 (Supp.2010), and no mention is made in any of them of limiting the sales triggering the tenant's opportunity to purchase to those made for purposes of demolition or discontinuance of housing use.

The repeated adoption of amendments and revisions which would have little or no effect under the owners' proposed construction confirms the lesson of the legislative history, namely, that such a construction was not intended and probably never crossed the Councilmembers' minds. Although "the views of a subsequent [Council] form a hazardous basis for inferring the intent of an earlier one," *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960); but *cf. Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–81 & n. 8, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), it is implausible to suggest that the Council adopted all of these amendments while believing that only sales for purposes of demolition or discontinuance of housing use were covered by TOPA.

Further, the owners' interpretation would so diminish the significance of the terms "sell" and "sale" in the statutory

scheme that it cannot be reconciled with the Council's careful attention to detail regarding what constitutes a "sale," what an "offer of sale" must include and who must receive it, the obligation to bargain in good faith, the tenant's right to assign or sell his or her rights, procedures governing negotiations for housing accommodations of different sizes, requirements for the formation of tenant organizations to negotiate sales contracts for accommodations with five or more units, and a description of the timing of sales covered by the Act. All of these matters are addressed in the statute. *See* D.C.Code §§ 42–3404.02 to –3404.12. There would be no reasonable purpose for such an elaborate scheme if the Council had intended TOPA to provide tenants with an opportunity to purchase *only* when rental units are about to be demolished or discontinued as housing use—a relatively infrequent event. Indeed, it appears that of this court's many decisions construing TOPA that are cited in the briefs of the parties or *amicus curiae,* demolition or discontinuance of housing use was contemplated in only one. *See 1618 Twenty–First St. Tenants' Ass'n v. The Phillips Collection,* 829 A.2d 201 (D.C.2003).

**G.** *Conflict with other statutory provisions*

"When two statutes are *capable* of coexistence, it is the duty of the courts, absent a clearly expressed [legislative] intention to the contrary, to regard each as effective." *DeGroot v. DeGroot,* 939 A.2d 664, 670 (D.C.2008) (emphasis in original) (citation omitted). "If related statutes conflict, we must reconcile them." *Washington Teachers' Union, Local #6 v. District of Columbia Pub. Schs.,* 960 A.2d 1123, 1132 (D.C.2008) (citations omitted). The owners' proposed reading of D.C.Code § 42–3404.02(a), however, conflicts with

other provisions of TOPA and related statutes.

For example, the tenant's statutory right of first refusal is inconsistent with the owners' theory that a tenant's opportunity to purchase arises only if the sale is for purposes of demolition or discontinuance of housing use. "In addition to any and all other rights specified in this subchapter," TOPA affords tenants "the right of first refusal during the 15 days after the tenant or tenant organization has received from the owner a valid sales contract to purchase by a third party." *Id.* § 42–3404.08. The statutory right of first refusal contains no language limiting it to situations involving the proposed demolition or discontinuance of housing use.

There is no reason for the scope of the right to receive a bona fide offer of sale to differ from the scope of the right of first refusal; indeed, to suggest such a difference would be incongruous. TOPA is structured in such a way that the right of first refusal and the right to an offer of sale function in tandem, and if one applies to all sales, so necessarily must the other. Section 42–3404.08, for example, provides that if the third-party contract is received during the negotiation periods pursuant to §§ 42–3404.09(2), § 42–3404.10(2), or § 42–3404.11(2)—which come into play only when the tenants have received an offer of sale—the 15–day period to exercise the right of first refusal will begin to run at the end of the negotiation period. *See 1836 S St., Tenants Ass'n,* 965 A.2d at 839–40 (describing the interplay between a tenant's right to receive a bona fide offer of sale and the right of first refusal).[22]

Further, to construe § 42–3404.02(a) as requiring owners to afford their tenants an opportunity to purchase when they sell their units only if the sale is "for purposes of demolition or discontinuance of housing use" creates a conflict with D.C.Code § 42–3505.01(e). That provision states that

> [a] housing provider may recover possession of a rental unit where the housing provider has in good faith contracted in writing to sell the rental unit or the housing accommodation in which the unit is located for the immediate and personal use and occupancy by another person, *so long as the housing provider has notified the tenant in writing of the tenant's right and opportunity to purchase as provided in Chapter 34 of this title.*

*Id.* (emphasis added). This provision makes it clear that an owner who seeks to sell a unit for the immediate and personal use and occupancy of another person must first afford the tenant an opportunity to purchase the accommodation as provided in TOPA. However, the owner in this situation plainly would not be selling the unit for purposes of demolition or discontinuance of housing use; indeed, continued housing use is the very purpose of the sale. Section 42–3505.01(e) can be given effect only if § 42–3404.02(a) is construed as requiring owners to provide tenants with an opportunity to purchase for *all* sales, not merely those for purposes of demolition or discontinuance of housing use. *See Washington Teachers' Union,* 960 A.2d at 1132.

Finally, the RHCSA provides that "[t]he purposes of this chapter favor resolution of ambiguity by . . . a court toward the end of strengthening the legal rights of tenants or tenant organizations to the maximum extent permissible under law." D.C.Code § 42–3405.11. Even if we were to assume,

---

**22.** Section 408 of the RHCSA, D.C.Code § 42–3404.08, was amended in 1983 to provide that the 15–day period for exercising the right of first refusal begins to run at the end of the negotiating periods for offers of sale. *See* D.C. Law 5–38, § 2(j) (1983).

*arguendo*, that the punctuation of § 42–3404.02(a) creates an ambiguity regarding whether TOPA rights extend to all sales or only to sales for purposes of demolition or discontinuance of housing use, and even if that ambiguity remained (which it does not) after TOPA's legislative history and the statute's interplay with related provisions are taken into account, we are required by the Act to resolve any such ambiguity in favor of the broader coverage, thereby advancing the legal rights of tenants and of organizations that represent them.

## H. *Purposes of TOPA*

As we have noted above, the owners base their claim that TOPA requires notice to tenants only in demolition/discontinuance situations not merely on the punctuation of the relevant provision, but also on the purpose of the Act, which they describe as being the preservation of the availability of rental housing, especially for persons of low or moderate income. They argue that a sale of an apartment building by one landlord to another does not contravene that purpose if the building continues to be used as a rental accommodation, and is not converted into a condominium or a cooperative. But the RHCSA has several purposes, and the one on which the owners base their argument is not the only one. *See* D.C.Code § 42–3401.02. Although "the prime goal of the legislation, [was] to avoid the erosion of affordable rental housing[,]" *Hornstein v. Barry,* 560 A.2d 530, 534 & n. 6 (D.C.1989) (en banc); *see* D.C.Code § 42–3401.02(1), (2), (6), the Council has also made it "an explicit purpose of the Act to strengthen the bargaining power of tenants" and "to encourage the formation of tenant organizations." *Id.* In addition, as we recently explained in *Malik Corp. v. Tenacity Group, LLC,* 961 A.2d 1057, 1062 (D.C.2008), "the Council . . . enacted TOPA to discourage the dis-placement of tenants through the sale of rental properties and to provide tenants opportunities for home ownership, without interfering with a landlord's property rights."

TOPA accords to the tenant not only the right to purchase the rental unit before the owner may sell it to a third party, D.C.Code § 42–3404.02(a), but also the right to assign his or her right. *See id.* § 42–3404.06. "Tenants—the class whom TOPA was designed to protect—thus receive a significant and tangible benefit from the legislation." *Allman,* 888 A.2d at 1169. "As a result of the statute's enactment," we concluded in *Allman,* tenants "have something of value—assignable TOPA rights—for which a prospective assignee is likely to be willing to pay, and in many cases has paid, in order to acquire the property." *Id.*

Enabling tenants to enjoy such benefits promotes the goals of "creating home ownership for lower income tenants, preserving affordable rental housing, and minimizing displacement." D.C.Code § 42–3401.02(6a); *see also id.* § 42–3401.02(1). At the same time, it "strengthen[s] the bargaining position of tenants," *id.* § 42–3401.02(1), and "encourage[s] the formation of tenant organizations," *id.* § 42–3401.02(6), to take advantage of these benefits in multi-unit buildings. Affording tenants an opportunity to purchase serves these statutory purposes, even where, as here, the apartments are not converted into condominium units, and where Housing Provider A simply seeks to sell a building to Housing Provider B. We therefore cannot agree with the owners that their proposed restrictive construction of TOPA is consistent with, or vindicates, all (or even most) of that Act's remedial purposes.

## I. The owners' constitutional contentions

The owners further contend that if TOPA is construed as applying to all sales, rather than only to sales for the purpose of demolition or discontinuance of housing use, then it is a "Law impairing the Obligation of Contracts," in violation of Article I, § 10, cl.1 of the Constitution. They also assert that "[t]he interpretation of subsection (a) offered by appellants is a disguised tactic to assist in a redistribution of wealth that infringes on the property rights of owners and is not centered around any legitimate public policy." These contentions are without merit.

It is a familiar canon of statutory construction that "statutes are to be so construed as to avoid serious doubt of their constitutionality." *International Ass'n of Machinists v. Street*, 367 U.S. 740, 749, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); *United States v. Rumely*, 345 U.S. 41, 45, 73 S.Ct. 543, 97 L.Ed. 770 (1953); *see also Gay Rights Coalition Georgetown Univ. Law Ctr. v. Georgetown University*, 536 A.2d 1, 16 (D.C.1987) (en banc). Thus, if the choice before us were between one construction of TOPA which leaves no question as to the statute's validity and a second construction that raises significant doubts on that score, we would be obliged to treat such doubts as one factor in our calculus supporting the first construction. These appeals do not, however, present such a situation.

As the en banc court stated in *Hornstein*, in sustaining another provision of the RHCSA against a constitutional challenge, "[l]aws adjusting the burdens and benefits of economic life come to the courts with a presumption of constitutionality." *Hornstein*, 560 A.2d at 533–34. That presumption continues in effect "until the contrary is shown beyond a reasonable doubt." *Id.* n. 5 (citations omitted). "Owners must make a very compelling showing indeed before this court may invalidate the RHCSA without impermissibly encroaching upon legislative prerogatives." *Id.* at 534. Assuming that the Contract Clause applies in full force to the District of Columbia by operation of the Home Rule Act, *see* D.C.Code § 1–203.02 (2001),[23] it has long been established law that the Clause applies only to the *retroactive* application of statutes to existing contract obligations. *See, e.g., Ogden v. Saunders*, 25 U.S. 213, 12 Wheat. 213, 6 L.Ed. 606 (1827) ("[t]he validity of these laws can never be questioned ... unless they operate, by their express provisions, upon contracts previously entered into"); *Chicago B & Q R. Co. v. Cram*, 228 U.S. 70, 85, 33 S.Ct. 437, 57 L.Ed. 734 (1913), ("a complete answer to the contention that the statute impairs the[ ] obligation of [the contracts at issue] is that they were made subsequently to the statute and are subject to it"); *Lynce v. Mathis*, 519 U.S. 433, 439 n. 12, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997) ("Article I, § 10, cl. 1, prohibits States from passing another type of retroactive legislation, laws 'impairing the Obligation of Contracts'"). In short, the application of an existing statute to a contract executed after the statute's enactment is not an impairment of constitutionally protected contract rights. TOPA was enacted in 1980, almost a quarter of a century before the challenged contracts here at issue were

---

23. The Contract Clause itself provides that "*No State* shall ... pass any Law ... impairing the Obligation of Contracts." (Emphasis added.) *But see District of Columbia v. Am. Fed. of Govt. Employees*, 619 A.2d 77, 85 (D.C.1993) (under the provisions of D.C.Code § 1–204 (2001), since recodified, legislation enacted by Council of the District of Columbia is subject to the strictures of the Contract Clause); *West End Tenants*, 640 A.2d at 733–36 (holding that the retroactive application of 1989 amendment to TOPA to the transaction there at issue would have violated the Contract Clause).

executed, and the Contract Clause therefore is not implicated.

The owners also appear to attack the application of TOPA to all sales on Due Process grounds. However, notwithstanding their claim that TOPA as heretofore construed promotes what might be characterized as a Robin Hood-style "redistribution of wealth" in disguise, the statute is not quite as revolutionary as that. TOPA requires an owner who wishes to sell a housing accommodation to provide the tenants with an opportunity to purchase that accommodation "at a price and terms which represent *a bona fide offer of sale.*" D.C.Code § 42–3404.02(a). (Emphasis added.) Moreover, the closely related right of "first refusal," *see* § 42–3404.08, requires the tenants, in effect, to match any offer made by a third party. Thus, if the tenants elect to exercise that right, the owner will be able to sell the accommodation for the same price and on the same terms as if the sale were to a third party purchaser. Accordingly, it is difficult to understand how the statute "redistributes wealth," regardless of whether or not its reach is limited to sales for purposes of demolition or discontinuance of housing use. TOPA does strengthen the bargaining power of tenants, but even if we assume, for the sake of argument, that the effect of the statute as heretofore construed is to improve the financial condition of some less affluent citizens, and to a very limited extent to reduce the gap between rich and poor, the same might likewise be said of the graduated income tax, publicly assisted housing, Medicare, unemployment compensation, and a host of other programs. The owners have cited no authority, and we know of none, that would support a holding that TOPA is unconstitutional because it somehow "redistributes wealth."

## V.

The judgments in Nos. 08–CV–1027, 08–CV–1114, 08–CV–1354, and 09–CV–106 are affirmed. The judgments in Nos. 08–CV–1438 and 08–CV–1340 are reversed, and these cases are remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*